## McGEE et al. v. STONE et al.

Where two several mining companies agree upon a boundary-line between the claims of the two companies, and, subsequently, other parties purchase the several interests of the two companies, with a knowledge of the boundary-line so fixed, both parties are concluded by it, and are estopped from denying the line.

The fact that such line was fixed by a mistake as to the true boundaries and corners, makes no difference, as the subsequent purchasers purchased with a view to this line.

APPEAL from the District Court of the Fourteenth Judicial District, County of Sierra.

A statement of the facts appears in the opinion of the Court.

*William Stewart and A. Platt* for Appellants.

The evidence shows that the stake was stuck at "B," after due deliberation, and was afterwards recognized by a long series of acts; that both parties had equal means of information, and that all of the present members of the Star Point Company have purchased in good faith, with a stake standing at "B," written upon, in the handwriting of Delancy, to the effect that it was on the dividing line.

The learned commentator, Judge Story, says, that "where the means of information are open to both parties, and where each is presumed to exercise his own skill, diligence, and judgment in regard to all extrinsic circumstances, in such cases equity will not relieve." Story's Equity, 149.

The same author, in another place, holds the following language : "It is not sufficient, in all cases, to give the party relief, that the fact is material, but it must be such as he could not, by reasonable diligence, get knowledge of; for, if by such reasonable diligence, he could have obtained knowledge of the fact, equity will not relieve him." 1 Story's Equity, 146.

The defendants, so far from being allowed to excuse their conduct by mistakes, ought to be estopped from denying "A B" to be the true line. They have induced us to purchase on the faith of their acts and declarations, and they ought to be allowed to contend that they have acted falsely from the beginning. Hastler *v.* Hays, 3 Cal., 306.

In the last-named case, the Court says, that "The sense of estoppel is, that a man, for the sake of good faith and fair deal-

ing, ought to be estopped from saying that to be false, which, by his means has become accredited for truth, and by his representations has led others to act."

And upon this point, Professor Greenleaf lays down the following rule:

"Admissions, whether of law or of fact, which have been acted upon by others, are conclusive against the party making them, in all cases, between him and the person whose conduct he has thus influenced. It is of no importance whether they were made in express language to the person himself, or implied from the open or general conduct of the party. For in the latter case, the implied declaration may be considered as addressed to every one in particular who may have occasion to act upon it. In such cases, the party is estopped, on grounds of public policy and good faith, from repudiating his own representations." 1 Greenleaf on Evidence, § 207.

"It makes no difference in the operation of this rule whether the thing admitted was true or false, it being the fact that it has been acted upon that renders it conclusive." Ibid., § 208.

See, also, 2 Cowen & Hill's Notes to Phillipps on Evidence, 202, et seq.; 3 Selden, 218.

In *Rockwell v. Adams,* 7 Cowen, 761, the Court hold that a practical location by a party, or his recognition of a line giving him less land than the actual courses and distances in his deed, may be valid, though he does not know at the time that it will have such an effect. To bind him, there need not be an express agreement. Acquiescence for a length of time, is evidence of such agreement; and where the lines are acquiesced in for a number of years by all interested, it is conclusive evidence of an agreement to the line.

In The Same *v.* The Same, reported in 6 Wend., 467, the Court holds that the acts and declarations of parties, as to the location of lands, may control the courses and distances in their deeds; and to give operation to such acts and declarations, it is not necessary that their effect should be known to the parties. See, also, Jackson *v.* Jackson, 4 Cowen, 450.

In the case at bar, the defendants established their line, and marked it in a distinct and conspicuous manner, and after nearly two years, which is longer, comparatively, in a mining locality, than twenty years is among farmers, where innocent parties had purchased and discovered gold, changed their lines so as to include the lead, and now say that they were mistaken.

Jackson *v.* McConnell, 12 Wend., 421, is also in point. In that case, the Court say that the charge of "the (Circuit) Judge was not altogether accurate. It was calculated to impress upon the jury, that the rule of law was, that the plaintiff was not bound by the location, if it was erroneous in any respect, unless he knew of the error at the time, and expressly agreed to be bound

SUPREME COURT—APRIL TERM, 1858.

by it." This was the precise error of the Judge, in Rockwell v. Adams, 7 Cowen, 762, and for which a new trial was granted. The true rule will be found in that case. It is subsequently recognized in 6 Wendell, 467, and in McCormick v. Barnum, 10 id., 105; Van Wyck v. Wright, 18 Wendell, pp. 157, 168.

A similar principle is decided by this Court, in Bell v. Meehan, 2 Cal., 160, in which the Court say: "Mistake, or ignorance of fact, is said to be the proper subject of relief, when the fact constituted a material ingredient in the contract of the parties, and disappoints their intention by mutual error, or where it is inconsistent with good faith. But when each party is innocent, and there is no concealment of facts which the other party ought or has a right to know, and no surprise or imposition exists, the mistake, whether mutual or unilateral, is treated as laying no foundation for equitable interference, and is strictly *damnum absque injuria.*

*McConnell & Niles* for Respondents.

This was an action of ejectment to recover possession of mining-claims.

The errors alleged which will require the consideration of this Court, are contained in the instructions given, at the request of defendants, in the Court below.

1. The principle contained in several of these instructions, may be stated as follows:

That the admissions of an individual member of a mining company, in regard to the boundaries and extent of the company's claims, are not conclusive evidence against the company, of the truth of the facts admitted.

The theory upon which these instructions were given, is this: that several part-owners of mining-claims are tenants-in-common of the ground; and one tenant-in-common can not bind his co-tenants by admissions in regard to the extent of the common property.

It might well be contended that members of a mining company are not to be considered, in any respect, as partners. They are not engaged in trade. They neither buy nor sell. The interest of each member is transferable at his will, without working any dissolution of the company.

But it is not necessary to consider at length the relation which the members sustain toward each other, in regard to the objects of their connection and the nature of their interest in the profits and losses of the enterprise.

Considering them in the most favorable light to plaintiffs, for the sake of this argument, viz.: as partners in the proceeds and the working of the claims, yet we say that they hold these claims as tenants-in-common, and subject to all the incidents of such tenancy.

McGee v. Stone.

Lands acquired by a partnership, for partnership uses. are held by them as tenants-in-common.   Collyer on Partnership, § 133, et seq.; Coles v. Coles, 15 Johns. R., 160; Livingston v. Lynch, 4 Johns. Ch. R., 574; Buchan v. Sumner, 2 Barb. Ch. R., 165; Cookson v. Cookson, 8 Simons, 529; Custance v. Bradshaw, 4 Hare, 315; Dyer v. Clark et als., 5 Metcalf, 582.

The cases above cited establish the rule that all real estate of a partnership is held by the partners as tenants-in-common. This rule is adopted as more beneficial and equitable than a joint-tenancy, with its quality of survivorship.   As between the partners themselves, it may perhaps be considered as the settled rule that Courts of Equity will regard such real estate as partnership assets, and personal property, for the single purpose of protecting the partners' equitable liens; and this only as between the partners themselves.   It has sometimes been viewed in the same light as between the personal representatives and the heir of the deceased partner, but it is doubtful if the weight of authority will go so far.

But, in all cases, the estate of the partners is a tenancy-in-common, and subject to all the incidents of such tenancy, both in law and in equity, except for the purposes above mentioned.

Defendants' instructions, numbered seven and eight, are direct deductions from the doctrine of tenancy-in-common.

Instructions numbered seven and eight, state the principle that one member of a mining company can not fix the boundaries of the claims so as to bind the other members.

If the members are tenants-in-common, these instructions are necessarily correct.

A tenant-in-common cannot prejudice his co-tenant in any matter relating to their common estate.   1 Hilliard on Real Prop., 582.

This follows from the very nature of the tenancy.   Each member holds by a title separate from the others.   His interest is not confined to any particular portion of the land, but extends to the whole and every part of it.   One man can not sell or transfer the title of land which belongs to another.   Neither can he, by any admissions, estop another from claiming and holding his own property.

The admissions of one of several parties to a suit are not admitted to affect the others who may happen to be joined with him, unless there is a joint interest between them.   1 Greenleaf's Ev., § 174; Dan v. Brown, 4 Cowen, 492.

The Court will observe that neither of these instructions at all exclude from the jury the evidence in regard to these admissions. We think, indeed, that the evidence was not competent for any purpose, and should have been entirely excluded by the Court. But it was not so excluded.   And, whether it was admissible as against the individual members who made the admission, or as

going to show in any way the extent of the claims of the defendants, is not now a question before the Court.

The instructions simply say, that the defendants are not bound by the unauthorized act of Delancy; and that the single member of a mining company cannot settle the boundaries (unauthorized) so as to bind the company.

This language plainly means that such acts and admissions are not conclusive against the company; that they do not create an estoppel as against the other members. They are not bound by such admissions.

2. The principle embodied in instructions numbered four, six, nine, and ten, is this: That if the admissions made by individual members of defendants' company, were made under a mistake in regard to the real facts, then the company are not bound by such admissions.

If the doctrine for which we contend be correct, viz.: that members of a mining company are tenants-in-common of their claims, these last-mentioned instructions are superfluous, and it will not be necessary to consider them. For this Court will perceive that there is no evidence whatever of any admissions, except by individual members of defendants' company. If these admissions are not binding upon the company, it can not matter at all whether they were made under a mistake as to facts or not; for they can not be received as evidence to bind the company in either case.

Admitting, however, for the sake of the argument, that such admissions may bind the company, if made with full knowledge of the facts on the part of those who made them, we still say that they are not binding if made under a mistake with regard to such facts.

"It would be unreasonable to preclude a defendant from showing that the plaintiff had no title, or that he himself had the title to the premises in question, if the acknowledgment of the title of the plaintiff was produced by imposition, or made under a misapprehension of the rights of the respective parties." Opinion of Judge Nelson in Jackson v. Spear, 7 Wendell, 401.

It may be urged by the plaintiffs, that the instruction numbered six goes too far, inasmuch as it declares, that if the jury are satisfied that such declarations (of defendants Delancy, Pattenburg, and Robinson,) were made under a mistake as to the real facts, then they must find for defendants."

The Court will observe, however, that the plaintiffs' case rested entirely on the admissions of these defendants. No other evidence of plaintiffs' title was introduced. It is, of course, incumbent upon plaintiffs in an action of ejectment to make out their own title. If the admissions of Delancy, Robinson, and Pattenburg, were not evidence against the company, the jury were

bound to find for defendants; there being no other evidence to support plaintiffs' claim. Hence, the instruction was correct.

No rule is better known than that which requires instructions to be construed with direct reference to the evidence. Now, a glance at this case will show the Court that the whole of plaintiffs' evidence consisted of an attempt to show that Delancy, and other members of the defendants' company, had admitted that the line between themselves and the plaintiffs' claims, passed through the points A and B, instead of the points A and L and M. If it did not pass through A and B, then plaintiffs' case fell to the ground; because they did not offer to prove that it passed through other points.

Burnett, J., delivered the opinion of the Court—Terry, C. J., concurring.

This was an action to recover the possession of certain mining-claims. The plaintiffs compose the Star Point Company and the defendants the Michigan Company. The Star Point Company consisted originally of four members, who located the claims in 1854—one for each member of the company, and one by right of discovery—making five claims in all, each fronting one hundred feet, and running back four hundred feet. The Michigan Company located their claims with and adjoining those of plaintiffs, on the next day. For some time after the locations, the miners of that locality considered the front ground only as containing gold; but, subsequently, they became convinced that the heavier deposits would be found under the hill lying back of the first locations. A meeting of the miners of that vicinity was held in August, 1855, at which it was agreed that claims should be extended back to the summit of the hill, in the rear. The controversy in this case regards the line between those two companies. The plaintiffs insist that the line was agreed upon by mutual consent, in 1855; while the defendants insist that such agreement did not bind the Michigan Company, as it was not agreed to by all the members, and that the agreement was founded upon a mistake of facts. In the Court below, the defendants had judgment, and the plaintiffs appealed. The errors assigned go to the giving of a certain instruction, at the request of the defendants, and in refusing the plaintiffs a new trial.

The fourth, sixth, and ninth instructions, embrace substantially the same principle. The ninth is in these words:

"That if the jury believe, from the evidence, that the stake set at the point represented on the map as "B," at the meeting of August, 1855, was placed there under a *mistake* as to the true boundaries and corners, then that the Michigan Company are not bound by such stake or corner."

There was some apparent, though very little of any real contradiction, in the testimony as to the leading facts of the case.

39

It appears that, at the meeting of the miners of that locality, in August, 1855, it was agreed that the Star Point Company, being the original locators, should first designate their lines, extending their original claims back to the summit of the hill; and that the adjoining companies should afterwards designate their lines.   One or more members of other companies went upon the ground, and, by mutual consent, marked a tree, as designating the southern extension line of the Star Point Company.   From this point they went north to a point near a large rock, to designate the line between these two companies.   The point first selected was not satisfactory to the Michigan Company; but, finally, a stake was set, by mutual consent, at the point marked " B."   It seems very clear, from the testimony, that it was supposed by all parties that this stake was in range with the northern line of the Star Point Company's original claims.   But in this they were mistaken, as it turned out, upon actual survey, to have been too far north.   This line was acquiesced in by both companies, for about two years, and was never disputed by the Michigan Company, until they found, from actual survey, that they had by mistake crossed this dividing line with their tunnel.   In the mean time, the present members of the Star Company had, *bona fide*, purchased the shares of the former owners.

It is not necessary to determine whether this mistake, in designating the dividing line, could be corrected as between those who were members of the two companies at the time it was made.   The question now arises between *subsequent purchasers*.

The learned counsel for the plaintiffs insist that, conceding the members of both companies, at the time, were mutually mistaken as to the true course of the line between the two companies, the Michigan Company is estopped from disputing that compromise line as against the plaintiffs.   If this position of the counsel be correct, the instructions of the Court below were erroneous.

In the late case of Mitchell *v.* Reid we had occasion to examine the doctrine of estoppel.   In that case we held that "the particular *intention* with which the declaration was made, is not material, except, perhaps, where the communication is confidential. It is the fact that the declaration has been acted upon by others that constitutes the liability to them."

There was no pretence of fraud on either side, in adjusting the line between the two companies.   The intentions of both parties were innocent, and both were mistaken.   Since that time other innocent parties have purchased, with a view to this compromise line.   It seems that all the three members of the Star Point Company have since sold their shares to the present plaintiffs, and that similar transfers have been made by most of the three members of the Michigan Company; so that the contro-

versy, on both sides, is substantially between subsequent purchasers, who have all purchased with a view to this line.

Under the circumstances of this case we can not see how the instructions of the Court could be sustained. Where one of two innocent parties must suffer, he who committed the mistake must bear the loss. It is but just to say that the learned Judge of the District Court expressed great doubts as to the correctness of some of the instructions given at the request of the defendants, and overruled the motion for a new trial, with the view of having the question decided by this Court.

The twelfth instruction given at the request of defendants seems to have been erroneous. The question was one simply between these two companies, and the compromise line would bind them whether the claims of the plaintiffs would be good or not, as between them and third persons, who were not parties to this suit, and under whom neither the plaintiffs nor defendants claim.

It is unnecessary, and would not be proper for us to decide whether the Court properly refused the application for a new trial upon the ground that the verdict was contrary to the testimony. Under the instructions of the Court, the jury could not well have found otherwise.

Judgment reversed, and cause remanded for further proceedings.